UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:   9:25-CV-80035-RLR

BRYANT GRANT,

    Plaintiff,

    -vs-

CITY OF WEST PALM BEACH and
ROMARIO A. SAUNDERS, individually,

    Defendants.

_____/

Deposition via Zoom

Thursday, August 21, 2025
10:14 a.m. to 11:29 a.m.

DEPOSITION OF

ROMARIO A. SAUNDERS

      Taken before Ebony Payne, Court Reporter, a
Notary Public for the State of Florida at Large,
pursuant to Notice of Taking Deposition filed in the
above-styled cause.

## Page 2

```
 1            APPEARANCES:
 2   On Behalf of the Plaintiff:
 3   ADOLPHE LAW GROUP, P.A.
 4   3918 Via Poinciana, Suite 1
 5   Lake Worth, Florida 33467-2991
 6   (561) 660-7776
 7   rjadolphe@adolphelawgroup.com
 8   BY:  ROLLANDE J. ADOLPHE, ESQUIRE
 9
10   On Behalf of the Defendant, Romario A. Saunders:
11   OLDS & STEPHENS, P.A.
12   312 11th Street
13   West Palm Beach, Florida 33401-3322
14   (561) 832-6814
15   dstephens@oslegal.com
16   BY:  DON STEPHENS, ESQUIRE
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1                  INDEX
 2   TESTIMONY OF ROMARIO A. SAUNDERS       PAGE
 3   Direct Examination by Ms. Adolphe       5
 4   Certificate of Oath             46
 5   Certificate of Reporter         47
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1   THEREUPON:
 2         COURT REPORTER:  Good morning.  We are now on
 3   the record.  Today is August 21st, 2025, at
 4   10:14 a.m.  We are here for the deposition of
 5   Romario Saunders, whose police officer's ID I have
 6   checked prior to the deposition commencing.  The
 7   witness is located today in West Palm Beach,
 8   Florida.
 9         My name is Ebony Payne.  I'm the court
10   reporter.  Would all counsel present please state
11   their appearance for the record?
12         MS. ADOLPHE:  Rollande Adolphe on behalf of
13   the Plaintiff.
14         MR. STEPHENS:  Don Stephens on behalf of
15   Officer Romario Saunders in his individual
16   capacity.
17         COURT REPORTER:  Okay.  I will now swear in
18   the witness.  Can you raise up your right hand,
19   please?
20            ROMARIO A. SAUNDERS,
21       having been first duly sworn and responding,
22   "Yes, I do," was examined and testified as follows:
23         COURT REPORTER:  Thank you very much.  Go
24   ahead, Counsel.
25         MS. ADOLPHE:  Thank you.  Thank you,
```

## Page 5

```
 1   Ms. Payne.
 2            DIRECT EXAMINATION
 3   BY MS. ADOLPHE:
 4     Q.  Good morning, Officer Saunders.
 5     A.  Good morning --
 6     Q.  My name -- my name is Rollande Adolphe, and I
 7   represent Mr. Grant in this case in an incident that
 8   happened on August 13, 2023.  Have you ever had your
 9   deposition taken before?
10     A.  In a different proceeding, yes.
11     Q.  Okay.  Well, I'm sure your attorney's already
12   went through the ground rules with you, but just so I
13   know for sure.
14        As you can see, we have a court reporter with us,
15   and because of the court reporter, it's very important
16   that any answer that you give is a verbal answer so that
17   she can write everything down and so that we can have an
18   accurate record; is that fair?
19     A.  Yes, ma'am.
20     Q.  Okay.  Perfect.  Also, if you could, I don't
21   know if you use words such as uh-huh or uh-uh, if you
22   do, if you could just refrain from using such words,
23   again, just so that we can have an accurate record.  It
24   that okay?
25     A.  Yes, ma'am.
```

1    Q.  Okay.  If I ask you any questions that you
2  don't understand, I would prefer you not answer.  Just
3  let me know that you don't understand my question.
4    Most likely it's probably my fault because of the
5  wording.  Let me know, and I'll reword it for you, okay?
6    A.  Yes, ma'am.
7    Q.  And I do not anticipate us being here for too
8  long.  However, if you need a break at any time, we
9  could go ahead and just ask for that break, and we'll
10  take that break.
11    A.  I understand.
12    Q.  Perfect.  Perfect.  Are there any reasons you
13  wouldn't be able to give me a full and complete answer
14  to any of my questions today?
15    MR. STEPHENS:  Objection.  Speculation.
16  BY MS. ADOLPHE:
17    Q.  You can answer.  Unless your attorney tells
18  you specifically not to answer, you can always answer.
19  Do you need me to repeat the question?
20    A.  No, ma'am.
21    Q.  Okay.  Well, are there any reasons that you
22  wouldn't be able to give me a full and complete answer to
23  my questions today?
24    MR. STEPHENS:  Same objection.  But, yeah, you
25    can go ahead and answer.

1    THE WITNESS:  No, ma'am.
2  BY MS. ADOLPHE:
3    Q.  Okay.  Thank you.
4    All right.  Let's begin.  For the record, will you
5  please state your full name?
6    A.  My name is Romario Saunders.
7    Q.  And where do you currently work, Officer
8  Saunders?
9    A.  I work for the City of West Palm Beach Police
10  Department.
11    Q.  And how long have you worked for the City of
12  West Palm Beach?
13    A.  Four years.
14    Q.  In what capacity do you work for them?
15    A.  As a patrol officer.
16    Q.  What is your current rank?
17    A.  Regular patrolman.
18    Q.  On August 13, 2023, what rank were you at that
19  time?
20    A.  I was still a patrolman.
21    Q.  Okay.  Before working for West Palm Beach as a
22  police officer, did you work anywhere else as a police
23  officer?
24    A.  No, ma'am.
25    Q.  Do you currently work as a police officer for

1  the West Palm Beach Police Department?
2    A.  Yes, ma'am.
3    Q.  Can you describe your training with pedestrian
4  stops and detentions?
5    A.  Excuse me?
6    Q.  Can you describe any trainings you had
7  concerning pedestrian stops?
8    MR. STEPHENS:  Objection to form.
9  BY MS. ADOLPHE:
10    Q.  Let me rephrase that for you.  Did you have
11  any training concerning pedestrian stops?
12    A.  In the field operating program, field training
13  program --
14    Q.  What --
15    A.  Go ahead.  I'm sorry.
16    Q.  When did you take the field training program?
17    A.  Upon -- upon release of the academy.  You
18  know, when you're by -- you're by yourself within, I
19  believe, like six months, six months of the training
20  program after you become a sworn officer.
21    Q.  When were you released from the academy?
22    A.  I believe 2022.
23    Q.  And after you were released, you spent six
24  months in field training?
25    A.  Yes, ma'am.

1    Q.  During this time, you had training
2  specifically on pedestrian stops?
3    A.  Pedestrian stops among others.
4    Q.  Can you go over how you were trained on
5  pedestrian stops?
6    MR. STEPHENS:  Objection to form.
7    MS. ADOLPHE:  Do you need me to repeat the
8  question?
9    MR. STEPHENS:  No, I don't think he needs you
10  to repeat it.  You're just asking him very broad
11  stuff.  But anyway, he can try to answer as best he
12  can.
13    THE WITNESS:  Are you asking for an example of
14  a pedestrian stop?
15  BY MS. ADOLPHE:
16    Q.  No, I'm asking specifically about the training
17  that you received on pedestrian stops.  Do you remember
18  that specific training?
19    A.  Not off the top of my head, no.
20    Q.  Okay.  Do you have any experience in
21  pedestrian stops?
22    A.  Yes.
23    Q.  Give me a specific example about one of your
24  experiences.
25    A.  If -- if an individual walks across the street

Page 10

1    without using the crosswalk provided, that's an
2    infraction, and I could stop them for that.
3         Q.  Okay.  Can you talk me through that stop?  How
4    would you stop a pedestrian?
5             MR. STEPHENS:  Objection.  This is
6    speculation.  He's not an expert.  He's here to
7    answer questions regarding an incident, not to
8    answer broad general questions that are
9    hypotheticals.  He's not an expert, and we've --
10   you know, and this is a waste of our time to ask
11   him about his opinion on other stuff that has
12   nothing to do with this case.
13        I believe you all had -- should have had --
14   received maybe his training stuff.  I think you
15   subpoenaed the City of West Palm for it.  You
16   should have -- you got the -- the information that
17   he was trained on if that's what you're trying to
18   get.  But you're asking him broad stuff.
19            MS. ADOLPHE:  Don, I'm not asking him any
20   expertise questions.  I'm asking him questions
21   about his personal experience about pedestrian
22   stops because that's what's involved in this
23   incident.
24            MR. STEPHENS:  Right.  But that would be like
25   me asking you about being a lawyer.  It's -- it's

Page 11

1    broad --
2             MS. ADOLPHE:  And if it -- and if I did
3    something wrong about being a lawyer, you would be
4    able to ask me that, my experience and what I've
5    done.
6             MR. STEPHENS:  You're not asking him about any
7    specific thing.  You're asking him about --
8             MS. ADOLPHE:  His knowledge.  I'm asking him
9    about his personal knowledge.  I'm allowed to ask
10   him about his personal knowledge and personal
11   experience.
12            MR. STEPHENS:  That's not about personal
13   knowledge regarding -- that's relevant to this
14   case.  You're asking him broad, general things, and
15   you're asking him about hypotheticals -- you're
16   asking him hypothetical questions.
17        There's -- this is not appropriate for a lay
18   witness.  That's all I'm saying.  But go ahead.
19   You can go through this exercise for a while.
20   BY MS. ADOLPHE:
21        Q.  Okay.  Talk me through how you would stop a
22   pedestrian.
23            MR. STEPHENS:  Objection.  Again --
24            MS. ADOLPHE:  Based on your experience.
25            MR. STEPHENS:  Same objection.  This is a

Page 12

1    hypothetical question that has nothing to do with
2    this case, and it's general and overbroad.
3             MS. ADOLPHE:  Okay.
4             MR. STEPHENS:  It's impossible to answer.
5             MS. ADOLPHE:  I'm not -- I'm not sure --
6    BY MS. ADOLPHE:
7        Q.  Is it impossible for you, Mr. Saunders, to
8    answer that question?
9        A.  I'm -- I'm with -- with my representative.
10            MR. STEPHENS:  Well, if you can answer it --
11   BY MS. ADOLPHE:
12       Q.  I -- I understand, but you're the one being
13   deposed.
14            MR. STEPHENS:  Now, hold on.  Hold on.  If you
15   can answer it, answer it.  I'm just telling you,
16   I'm objecting because it's a broad, vague question
17   that's just trying to get his opinion on everything
18   in the world of law enforcement, which is an
19   inappropriate question for a deposition of a lay
20   witness.
21        That's all I'm saying.  But you can try.  If
22   you can answer her question, go ahead.
23            THE WITNESS:  Okay.  Can you repeat the
24   question for me, please?
25   BY MS. ADOLPHE:

Page 13

1        Q.  Yes, I can.  Based on your experience, can you
2    talk me through how you would stop a pedestrian?
3        A.  Yeah, in reference to the example that I just
4    provided, correct?
5        Q.  Yes, that is correct.
6        A.  Okay.  So I would approach the individual,
7    inform them of the infraction, ask them to identify
8    themselves, and if a citation or a warning is warranted,
9    then I'd provide either-or.
10       Q.  Thank you for that response.  Have you
11   received any training on the use of ShotSpotter?
12       A.  Yes, also in the FTO program, field training
13   officer program.
14       Q.  Other than in 2020 when you received your
15   training on the use of the ShotSpotter, have you
16   received any additional training?
17       A.  Ah, it's -- it's -- it's yearly.
18       Q.  Have you received training on the appropriate
19   use of force?
20       A.  Yes, that's also yearly.
21       Q.  Have you received training regarding
22   encounters with individuals experiencing mental illness?
23       A.  Yes.
24       Q.  Is that also yearly?
25       A.  Yes, ma'am.

Page 14

1     Q.  In your field training?
2     A.  Not field training but requirements to --
3  within the department and FDLE.
4     Q.  And what?
5     A.  FDLE, the Florida Department of Law
6  Enforcement.
7     Q.  Thank you.  On August 13, 2023, you were
8  dispatched to a call based on a ShotSpotter alert; is
9  that correct?
10    A.  Yes, ma'am.
11    Q.  What information did Dispatch provide to you
12 at that time?
13    A.  It provided me the address and where the --
14 the activation was coming from, and it also informed me
15 of the amount of rounds discharged.
16    Q.  Okay.  Anything else?
17    A.  No, ma'am.
18    Q.  Where was the location of the alert?
19    A.  1387 9th Court in West Palm Beach, Florida.  I
20 don't have the zip code here.
21    Q.  That's okay.  And how many rounds -- the
22 amount of rounds were discharged?
23    A.  Four -- four total rounds.
24    Q.  Were you given a suspect description?
25    A.  No, ma'am.

Page 15

1     Q.  Did you have any further follow-up
2  communication with Dispatch before arriving on the
3  scene?
4     A.  Just telling them that I'm in the area or
5  arriving in the area.
6     Q.  And, specifically, what area did you -- were
7  you arriving at?
8     A.  I was along the 1300 block of 9th Court.
9     Q.  Do you know whether anyone independently
10 confirmed the presence of gunfire that day?
11    MR. STEPHENS:  Objection to form.
12    THE WITNESS:  Can I answer?
13    MR. STEPHENS:  Yeah.  Well, you can answer it,
14 yeah.
15    THE WITNESS:  Okay.
16    MS. ADOLPHE:  If you know.
17    THE WITNESS:  No, ma'am, I don't know if
18 anyone confirmed anything, like an individual.  No,
19 ma'am.
20    MS. ADOLPHE:  Okay.
21    MR. STEPHENS:  I want to make sure you
22 understand her question.  She's not talking about -
23 - I believe -- and if you don't want me to say
24 anything, I will be quiet.  But I think she's
25 asking you whether anybody confirmed whether there

Page 16

1  was gunshot, not the individual who shot it.
2     THE WITNESS:  Okay.
3     MR. STEPHENS:  That's what --
4     THE WITNESS:  Okay, okay.  Well, there were --
5     MR. STEPHENS:  Wait, wait.  Am I right?  Is
6  that what you're asking him?  I just want to make
7  sure that's what she's asking.
8     MS. ADOLPHE:  I could ask the question again.
9  And, again, if you don't understand, Officer
10 Saunders, just please let me know.
11    MR. STEPHENS:  Yeah, I think he just
12 misunderstood what you asked, but I may be wrong.
13 But go ahead.  Sorry.
14 BY MS. ADOLPHE:
15    Q.  Yes.  Do you know whether anyone independently
16 confirmed the presence of gunfire that day?
17    A.  Yes.  There were neighbors in the area or the
18 vicinity that said they heard shots, yes.
19    Q.  Did you speak with any of those neighbors?
20    A.  No, ma'am.
21    Q.  Then how did you come to know this information
22 that neighbors said that they heard shots?
23    A.  Our responding officers -- assisting officers,
24 I should say, did knocks on the doors, and the Plaintiff
25 also said it as well from body camera footage.

Page 17

1     Q.  Did you watch that body footage -- that body
2  camera footage where Plaintiff said that there were
3  shots in the neighborhood fired?
4     A.  I heard that -- him saying that he heard
5  shots, yes.  And I don't know what he said verbatim, but
6  I did hear him say it.
7     Q.  Was he speaking with you when he said that?
8     A.  No, he was speaking to Lieutenant Fitz-Coy.
9     Q.  Where were you at that time?
10    A.  I was at another hospital with my injuries.
11    Q.  Was Plaintiff at that same hospital?
12    A.  No, ma'am.
13    Q.  Then how did you hear him say that to the
14 lieutenant?
15    A.  From my body worn camera, the footage observed
16 from everyone's camera.
17    Q.  This was your body worn camera, correct?
18    A.  No.
19    Q.  Was your -- okay.  Whose body worn camera was
20 it?
21    A.  I'm not sure whose it was.
22    Q.  Was this the first time you were dispatched
23 based on a ShotSpotter alert?
24    A.  No, ma'am.
25    Q.  Were you aware that at times the ShotSpotter

Page 18

1    alert can sometimes be inaccurate?
2        A.  I'm not -- I'm not trained to determine if the
3    system is -- is faulty.  There -- there's an address.
4    They tell me to go to the address.  That's where I go.
5    I'm not -- I don't -- I wasn't trained that way.
6        Q.  Approximately what time did you arrive at the
7    area identified by the alert?
8        A.  Per my report, 23:05.
9        Q.  Were you the first one at the scene?
10       A.  Yes, ma'am.
11       Q.  Did you personally hear gunfire?
12       A.  No, ma'am.
13       Q.  When you arrived at the scene, did you see any
14   signs of gun-related incident?
15       A.  What -- what are -- what are those -- what's a
16   gun-related incident?
17       Q.  Perhaps the weapon in the area, gunfire in the
18   area, people -- the different ways that people act when
19   there's been gunfire.
20       This is more your -- part of your experience than
21   it is mine.  So, again, did you see any signs of
22   gun-related incidents when you arrived?
23       A.  No, ma'am, I didn't.  I didn't come -- get to
24   the scene and saw a gun on the floor, if that's what
25   you're asking.

Page 19

1        Q.  Okay.  What was your specific assignment in
2    responding to this alert?
3        A.  I was a patrolman.
4        Q.  And as a patrolman, can you describe like the
5    exact duties?  What were you supposed to do?
6        A.  Respond to calls for service.
7        Q.  And once you respond, you arrive where you
8    need to be, what would be the next step?
9        A.  Evaluate the scene and see what needs to be
10   done thereafter.
11       Q.  When did you first see my client, Mr. Grant?
12       A.  When I -- when I parked my vehicle.
13       Q.  Where did you park your vehicle?
14       A.  Along the 1300 block of 9th Court.
15       Q.  Where exactly was he located when you first
16   observed Mr. Grant?
17       A.  I'm not sure the numeric of the number, but he
18   was pacing north and south in the roadway.
19       Q.  When you say, "pacing," what do you mean?
20       A.  Walking back and forth.
21       Q.  What else did you observe him doing, if
22   anything?
23       A.  Pacing back and forth in the area of where I
24   was dispatched.
25       Q.  Did you observe him engaging in any illegal

Page 20

1    activity?
2        A.  No, but I had a reasonable suspicion to
3    believe that he was the individual -- may have been the
4    individual that may have discharged a firearm of four
5    rounds.
6        Q.  What was your reasonable suspicion?
7        A.  Dispatched the call, around four rounds of
8    gunfire in the area, and the -- and it's only one person
9    in the roadway, which was the Plaintiff.
10       Q.  And he was just walking; is that correct?
11       A.  He was pacing back and forth in the area.  He
12   wasn't walking down the sidewalk.  He was pacing back
13   and forth in the roadway.
14       Q.  I'm sorry.  What was your definition of pacing
15   again?
16       A.  Walking back and forth.
17       Q.  Okay.  Did he match any suspect description
18   given to you?
19       A.  There was no suspect description provided.
20       Q.  Okay.  Were there any other individuals in the
21   area?
22       A.  No, ma'am.
23       Q.  Around what time of day was this?
24       A.  Nighttime.
25       Q.  Did you decide to stop Mr. Grant or detain

Page 21

1    him?
2        A.  I -- I decided to investigate what was going
3    on, assess the scene.
4        Q.  Did you say access the scene?
5        A.  Access the scene -- assess the scene.  I'm
6    sorry.
7        Q.  Thank you.  Other than the ShotSpotter alert,
8    did you observe anything specific about Mr. Grant that
9    led you to believe you had legal grounds to stop him?
10       A.  No.
11       Q.  Walk me through what you -- what happened
12   after you first saw Mr. Grant.
13       A.  Well, I exited my vehicle, approached him.  I
14   gave him verbal commands to let me see his hands for my
15   safety.  There were four rounds of gunfire that went off
16   in the same area that he was in, so I asked to see his
17   hands.
18       I unholstered my firearm as I was approaching him
19   because I couldn't see his hands from my distance.  Once
20   I was able to see both -- both of his hands, I -- I
21   holstered my firearm.  I asked if he had any -- anything
22   on his person.  He started like mumbling words that I
23   couldn't understand.
24       I -- I grabbed his right arm, and he pulled away
25   from me.  And that made me believe that he may have

Page 22

1  concealed -- may have been concealing the firearm. He
2  -- he pulled away. He had like a -- seems like clenched
3  his fists in an aggressive stance, so I believed that he
4  did have the firearm.
5      Grabbed his right arm, pulled him towards me, and
6  swept his right leg. On our way down to like any person
7  -- I'm trying to break my fall. We landed on my right
8  wrist, and I stayed down. I didn't strike him. I
9  didn't do anything after that, just stayed on him until
10 assisting officers arrived.
11     Q. Okay. When you asked Mr. Grant to let you see
12 his hands, did he at any time put his hands up?
13     A. Ah, yes.
14     Q. Was there anything in his hand?
15     A. No, there -- I mean, from where I saw, no. I
16 believe that's why I -- that's why I holstered my
17 firearm because I didn't see anything in his hands.
18     Q. Other than let you see his hand, did you give
19 any other commands?
20     A. Commands? No. I asked a question.
21     Q. Okay. What did you ask him?
22     A. If he had any -- anything on -- in -- on his
23 person. I believe the word I used was "contraband."
24     Q. And what did he say?
25     A. I -- I couldn't understand him.

Page 23

1      Q. While you were having this conversation with
2  Mr. Grant, what was the distance between you two?
3      A. He was within arm's reach from -- or arm's
4  length, yeah. The conversation when? Like close up or
5  when I was walking towards him?
6      Q. The conversation when you specifically asked
7  him, "Do you have any contraband?"
8      A. Okay. Yeah, I was within -- within arm's
9  reach of him.
10     Q. Thank you for clarifying that. And you said
11 he responded, but you did not understand; is that
12 correct?
13     A. Yes, I didn't understand the words that he was
14 saying.
15     Q. Did he -- go ahead.
16     A. No, I'm sorry. Go ahead.
17     Q. I was going to ask you, did Mr. Grant say
18 anything before -- did Mr. Grant say anything that you
19 did understand?
20        MR. STEPHENS: Objection to form.
21        Oh, withdraw that objection. Go ahead.
22        THE WITNESS: Okay. If I remember correctly,
23     I asked, "What's your name," or something about --
24     around that, like name. Something about name.
25 BY MS. ADOLPHE:

Page 24

1      Q. Did you ask him, "What's your name," or did he
2  ask you, "What's your name?"
3      A. He asked me.
4      Q. Okay. And what did you say?
5      A. I didn't respond. I don't believe I
6  responded.
7      Q. Did you do anything when he asked you that
8  question?
9      A. I don't -- I don't remember.
10     Q. Did that question upset you?
11     A. No.
12     Q. Why didn't you respond?
13     A. I -- I don't remember that -- that entire like
14 -- that part of the incident. I don't know why I didn't
15 respond.
16     Q. Okay. At any time during the conversation,
17 did Mr. Grant tell you that he was on his way home?
18     A. I don't remember.
19     Q. As a patrol officer, are you -- is there
20 designated areas where you patrol, where you are
21 assigned to patrol?
22     A. At the time?
23     Q. Yes.
24     A. I was assigned for the north end of the city.
25 That's from Banyan all the way north to 59th.

Page 25

1      Q. From Banyan to 59th?
2      A. Yes.
3      Q. And how long were you assigned that area?
4      A. No, I believe that was my second year or going
5  on to my second year.
6      Q. Your second year in that area?
7      A. In that -- yes, in that area.
8      Q. So you're familiar with that area?
9      A. Yes.
10     Q. Have you ever -- before this incident, have
11 you ever seen Mr. Grant in that area?
12     A. No.
13     Q. Was this the first time you've seen Mr. Grant?
14     A. Yes, ever.
15     Q. Okay. Did Mr. Grant attempt to flee?
16     A. No, when he pulled away and balled his fists
17 up -- I mean, the pulling away was that attempt to flee.
18     Q. I'm sorry. Say that again. The pulling away
19 was what?
20     A. I believe that pulling away was his attempt to
21 flee, but then once he balled his fists up, that's when
22 I took action.
23     Q. When he pulled away, did he start to run?
24     A. No, he did not run away.
25     Q. When he pulled away, what direction was he

Page 26

```
 1    facing you?  Were you two face-to-face?
 2       A.  Yes.
 3       Q.  When he pulled away, did his body turn, like
 4    he gave you his back?
 5       A.  He did not give me his back, no.
 6       Q.  Okay.  What did he do after he pulled -- when
 7    you said, "pulled away," what exactly did he pull away?
 8       A.  He pulled away his arm.
 9       Q.  Was it his arm or his wrist?
10       A.  His -- he pulled away.  He pulled his whole
11    arm away.
12       Q.  What were you holding?  Were you holding his
13    arm or his wrist?
14       A.  I pulled -- I was holding onto his wrist.
15       Q.  Okay.  And just to be clear, after he pulled
16    away, he maintained his position in front of you?
17       A.  No, he balled -- balled his fists up towards
18    me.
19       Q.  When he balled his -- was it both fists or
20    just one?
21       A.  Both.
22       Q.  Did he bring his arms up when he balled his
23    fists up?
24       A.  Quickly, yes.
25       Q.  Did he take on the stance as if he was going
```

Page 27

```
 1    to hit you?
 2       A.  Yes, he's -- he had an aggressive stance.
 3       Q.  Can you explain or describe that aggressive
 4    stance?
 5       A.  Both his -- like just -- I can't describe it.
 6    He had both fists up like somebody that's going to fight
 7    you.
 8       Q.  Okay.  No, that's good.  I understand.
 9          And once that happened, now he's in the stance in
10    front of you, both fists up, what do you do next?
11       A.  I grabbed him.
12       Q.  Where?
13       A.  Like -- I -- like chest to chest grabbed him.
14       Q.  Okay.  Did he -- was there any resistance when
15    you grabbed him?
16       A.  No.  I was -- my -- my objective was to gain
17    control of the situation at that point.
18       Q.  Did you ever tell Mr. Grant why you were
19    stopping him?
20       A.  No, I did not say anything.
21       Q.  Why not?
22       A.  I -- I was assessing the scene.  Once I
23    arrived -- I was assessing the scene once I arrived.  He
24    was the only person in the area.  I didn't -- I didn't
25    believe I had the -- time to speak.
```

Page 28

```
 1       Q.  You didn't have the time to speak?
 2       A.  No, ma'am.
 3       Q.  Approximately how many minutes elapsed between
 4    the time when you first saw Mr. Grant and when you
 5    grabbed him chest to chest?
 6       A.  I'm not sure of the -- the amount exactly.
 7       Q.  Was it about five minutes?
 8       A.  I'm not sure of the amount.
 9       Q.  Was it longer than 30 minutes?
10       A.  I'm not sure of the amount, ma'am.
11       Q.  Was it more than an hour?
12       A.  I am not sure of the amount, ma'am.
13       Q.  Okay.  Did you have a chance to review your
14    body cam before this deposition?
15       A.  Yes.
16       Q.  In total, how long were you at the scene for?
17       A.  I'm not sure of the amount of time, ma'am.
18       Q.  Okay.  Did Mr. Grant give you any verbal
19    threats?
20       A.  At what time?
21       Q.  When you two were -- at any time when you two
22    were communicating?
23       A.  No.  He said something while we were on the
24    ground, but, like I said, I couldn't really understand
25    him.
```

Page 29

```
 1          THE WITNESS:  Can I say the word that they
 2    said -–- that he said?
 3          MR. STEPHENS:  Well, you -- you can't ask me
 4    any questions.
 5          THE WITNESS:  Okay, okay.  Okay, okay.
 6    BY MS. ADOLPHE:
 7       Q.  What do you remember that he said, if you
 8    remember?
 9       A.  Can -- can I say it?
10       Q.  I don't know what it is.
11       A.  Okay.
12       Q.  Yes.
13       A.  Oh.
14       Q.  Is it a bad word?  Is it making you nervous
15    because it's a bad word?
16       A.  I don't want to say it.  I don't want to say
17    it.  It's another word for like penis, like on the
18    floor.
19          MR. STEPHENS:  Yeah.
20    BY MS. ADOLPHE:
21       Q.  Okay.  I got you.
22       A.  All right.
23       Q.  I respect that.  Thank you.  Is that what
24    you're considering a threat?
25       A.  No, no.  You asked me if he said anything
```

Page 30

1  during the conversation, and that's why I said when he
2  was on the ground, he said something along the lines of
3  like --
4      Q.  Okay.
5      A.  Yeah.
6      Q.  Thank you for that.  Did anyone from the
7  neighborhood come out while this interaction was
8  occurring between you and Mr. Grant?
9      A.  Not that I saw.
10      Q.  Okay.  Just so we're clear on the record, at
11  the time of your interaction with Mr. Grant, what
12  specific crime did you believe he had committed?
13      A.  Discharging a firearm in public.
14      Q.  Okay.
15      MR. STEPHENS:  Are you talking about after --
16  well, I -- I don't think I'll ask you about it.
17  BY MS. ADOLPHE:
18      Q.  Did you ever that night find a gun on
19  Mr. Grant?
20      A.  No, ma'am.
21      Q.  What about in the area -- did you or any of
22  the other officers find a gun in the area where
23  Mr. Grant was arrested?
24      A.  I'm not sure if they -- I don't think they
25  did.

Page 31

1      Q.  Okay.  Would you know if they did?
2      A.  I wasn't on the scene if -- when the -- at the
3  time if they did.  It doesn't look like they did.
4      Q.  Okay.  The technique that you used -- or I
5  don't know if it is a technique.  If it is, you can let
6  me know.
7      Is there a specific name for the technique that you
8  used to take Mr. Grant to the ground?
9      A.  I'm not familiar if there is a name for it --
10      Q.  Uh-huh.
11      A.  -- it's just what I did.
12      Q.  Understood.  And I'm trying to take notes, but
13  correct me if I'm wrong.  Did you state that when you
14  tried to take Mr. Grant down, you struck his right leg?
15      A.  I swept, like -- okay.  So I grabbed him, and
16  I swept his right leg.
17      Q.  You swiped?
18      A.  Swept.  Like -- like a sweep.  Like when
19  sweeping a -- a broom.
20      Q.  I understand.  Did you do that with your leg?
21  How did that maneuver go?
22      A.  I swept his leg with my leg.
23      Q.  Okay.  And at that time, he fell to the
24  ground?
25      A.  We fell to the ground.

Page 32

1      Q.  And you fell on top of him, correct?
2      A.  Yes.  I fell on -- yeah.
3      Q.  How long did you stay on top of him?
4      A.  It -- it wasn't very long.  I tried to let --
5  I tried to break my fall with my right arm, and once we
6  got down, he tried to like hit me, and I just -- I took
7  some of the blows, and then I transitioned over into
8  another technique that I use, like you would say, to get
9  a more comfortable -- more comfortable spot.
10      Q.  Mr. Grant tried to hit you?
11      A.  Yeah, he -- he didn't try.  He did.
12      Q.  Tell me where.
13      A.  He hit me in my forehead, the side of my face.
14      Q.  And how did he hit you?
15      A.  With his left -- left hand.
16      Q.  When Mr. Grant was on the ground, was he face
17  down?  Was his body like face down on the ground?
18      A.  No, his body was facing me, face -- face up.
19      Q.  So he was on his back on the ground?
20      A.  On his back.  Yes, ma'am.
21      Q.  Okay.  And then you said you did a maneuver or
22  technique?
23      A.  Yes.
24      Q.  What position did he end up in after that
25  technique?

Page 33

1      A.  He was in the same spot.  I just went to a
2  better controlling position to the -- to the side.
3      Q.  Is there a name for that technique?
4      A.  Side -- side control.
5      Q.  Okay.
6      A.  Side mount control.
7      Q.  Side mild control?
8      A.  No.  Side mount control, side mount.
9      Q.  Oh, okay.  I got it.  Thank you so much.
10      A.  But he didn't change positions.
11      Q.  Okay.  Did you have better control of his arms
12  at that time?
13      A.  I had better control of his body.
14      Q.  Okay.  Once you were in that position, did you
15  receive any more hits from --
16      A.  Probably one, an additional one, but officers
17  arrived after.
18      Q.  Okay.  That additional one, where was it to
19  your body?
20      A.  My -- my head area.
21      Q.  Head area?
22      A.  Yeah.
23      Q.  And was Mr. Grant still using his left arm?
24      A.  I'm not sure what hand it was, but I got
25  struck in the head.

Page 34

1     Q.   Okay.  So you had control of his body but not
2  his arms?
3     A.   Yes.  His -- one of his arms -- I can't
4  remember which one -- but it was holding onto the back
5  of my --
6     Q.   Your what?
7     A.   My vest.  I'm sorry.
8     Q.   Your vest?
9     A.   Yes.
10    Q.   Other than that one bad word you stated
11 earlier that Mr. Grant may have said, did he say
12 anything else to you while this altercation was going on
13 --
14    A.   No.
15    Q.   -- on the ground?  No?
16       Did you at any time frisk Mr. Grant, like pat him
17 down?
18    A.   On the ground?
19    Q.   At any time.
20    A.   No, I -- I wasn't able to.
21    Q.   Okay.  You were the only officer physically
22 involved in the takedown, correct?
23    A.   Yes.
24    Q.   Did you notice Mr. Grant injured during or
25 immediately after the takedown?

Page 35

1     A.   No.  Mr. -- Mr. Grant was not injured at all.
2     Q.   How do you know this?
3     A.   If I -- if I had injured him, he would have --
4  he would have screamed, told me that or said anything to
5  anyone about me injuring him.  He didn't make a noise.
6  He didn't make a scream towards me or anything like
7  that.  I -- if anything, I'm the one that was injured.
8     Q.   Did you scream?
9     A.   Did I -- no.
10    Q.   Okay.
11    A.   But my reaction after Mr. Grant was off me
12 says it all.
13    Q.   So at the time, you were not aware that he was
14 injured; is that correct?
15       MR. STEPHENS:  Objection to form.  He said he
16    was not injured, not that he wasn't aware.  That's
17    not what he said.
18 BY MS. ADOLPHE:
19    Q.   Did you ever become aware that he -- Mr. Grant
20 was injured?
21    A.   When I got -- this stuff.
22    Q.   When you say, "this stuff," what are you
23 referring to?
24    A.   Like I got served.
25    Q.   Okay.  What happened after the other officers

Page 36

1  came to the scene?  What did you do?
2     A.   I got away.  I got away from the area where
3  they were at, moved over to the side, and that was it.
4     Q.   Once you got away from the scene, did you ever
5  have any interaction with Mr. Grant?
6     A.   No.
7        MR. STEPHENS:  Just so you understand, I don't
8     think he's saying he got away from the scene.
9        THE WITNESS:  I --
10       MS. ADOLPHE:  I understand.
11       MR. STEPHENS:  Oh, okay, okay.  --
12       MS. ADOLPHE:  Thank you.  I appreciate that.
13       MR. STEPHENS:  Yeah.
14 BY MS. ADOLPHE:
15    Q.   Just so the record is clear and I'm clear,
16 once the other officers arrived at the scene and you got
17 away from Mr. Grant, did you have any other conversation
18 with him, with Mr. Grant?
19    A.   No.
20    Q.   No?  And you've never seen Mr. Grant after
21 that incident; is that correct?
22    A.   That's correct.  No.
23    Q.   Did you ever consider waiting for backup
24 before physically engaging with Mr. Grant?
25    A.   No.

Page 37

1     Q.   Why not?
2     A.   I was the first one on the scene in reference
3  to gunfire.  I take that as like an active-shooter
4  situation, like a school, so I'm -- I'm going in so.
5     Q.   Did you consider a less intrusive takedown?
6     A.   No.
7     Q.   Why not?
8     A.   My -- my goal was to gain control of the
9  scene, so I relied on my training.
10    Q.   Is this the training from your yearly training
11 or your field training?
12    A.   My year -- yearly training.
13    Q.   Is there a certain time of the year that you
14 accomplish your yearly training?
15    A.   It -- it -- not -- not at -- I don't know the
16 specific date, but it's every year.
17    Q.   Is it normally towards the beginning of the
18 year, the middle of the year?
19    A.   I can't remember.
20    Q.   Okay.  We were in August of -- August 13,
21 2023.  Do you remember if you had received training,
22 your yearly training, before this incident occurred that
23 year or after?
24    A.   I'm not -- I'm not sure of the date.
25    Q.   Okay.  Did you know that Mr. Grant lived in

## Page 38

1   that neighborhood?
2       A.  No, I'd never seen him before.
3       Q.  Did you have any information that Mr. Grant
4   suffered from a mental health condition?
5       A.  No, ma'am.
6       Q.  Did you observe any type of mental health
7   condition based on your training, based on your training
8   when you spoke with Mr. Grant?
9       MR. STEPHENS:  Objection to form.
10      You can answer.  Do you understand what she's
11  asking you?
12      THE WITNESS:  No, no.
13      MR. STEPHENS:  She can have the court reporter
14  read it back maybe.  I don't know.
15      THE WITNESS:  No, ma'am.
16      MS. ADOLPHE:  Not a problem.  I'll repeat.
17  BY MS. ADOLPHE:
18      Q.  Did you have any information that Mr. Grant
19  suffered from a mental health condition based on your
20  training?
21      A.  No, ma'am.
22      Q.  And just to be clear, you do get training on
23  mental health yearly also, correct?
24      A.  Yes.
25      Q.  Okay.  Based on your training, what are some

## Page 39

1   of the signs that you would have to look for?
2       MR. STEPHENS:  Objection to form.
3   BY MS. ADOLPHE:
4       Q.  Based on your mental health training, what
5   type of signs would you have to look for?
6       MR. STEPHENS:  I don't think he --
7       MS. ADOLPHE:  If you remember.
8       THE WITNESS:  I don't -- I don't remember,
9   ma'am.
10  BY MS. ADOLPHE:
11      Q.  You don't remember?  Okay.
12      You have a confused look on your face, so if you
13  don't understand, it's okay to say you don't understand.
14      It's either you don't remember or don't understand.
15  I'm not sure what the confused look means.
16      A.  I don't remember, ma'am.
17      Q.  Oh, it's you're not remembering.  Okay.  Thank
18  you.  We're almost done.
19      Based on your observation of Mr. Grant, did you
20  believe at the time he was confused?
21      A.  No.
22      Q.  Okay.  Did you believe at the time he fully
23  understood your commands?
24      A.  Yes.
25      Q.  Okay.  Do you know how far it was -- how far

## Page 40

1   was it between where you met Mr. Grant and the
2   ShotSpotter alert location?
3       A.  Probably a house or two down.
4       Q.  Is this a house or two down from where your
5   vehicle had parked?
6       A.  My vehicle was parked ways down.
7       Q.  Okay.  So when you say, "a house or two down,"
8   is this where you -- at the specific place where you met
9   Mr. Grant?
10      A.  Yes.
11      Q.  Okay.  Was Mr. Grant charged with any offense
12  as a result of this encounter?
13      A.  From what I see here, battery on an officer.
14  I don't have the other charges, but the battery on me,
15  yes.
16      Q.  Okay.  Did you file a use-of-force report
17  concerning this incident?
18      A.  I submitted a report, yes, ma'am.
19      Q.  Did anyone review your report?
20      A.  Lieutenant Fitz-Coy.
21      Q.  Fitz-Coy?
22      A.  Yes.
23      MR. STEPHENS:  It's Fitz-Coy, C-O-Y.
24      MS. ADOLPHE:  Thank you.
25  BY MS. ADOLPHE:

## Page 41

1       Q.  Are you aware of any street camera recording
2   of this incident?
3       A.  No, ma'am, but my body camera was on the
4   entire time.  As soon as I arrived on scene, my body
5   camera was on.  At no time there -- was there a delay.
6       Q.  Okay.  Did you review your body cam before you
7   wrote your report?
8       A.  Before?
9       Q.  Yes.
10      A.  I don't remember, but I would.
11      Q.  Okay.  Did anyone assist you in drafting your
12  report?
13      A.  No, ma'am.
14      Q.  Does the report reflect everything that
15  occurred during the encounter?
16      A.  Yes, ma'am.
17      Q.  Okay.  Looking back, do you believe that
18  Mr. Grant was involved in any criminal activity at the
19  time you stopped him?
20      MR. STEPHENS:  Objection to form.  You're
21  asking him about after the fact as opposed to what
22  he believed when he encountered it, and that's
23  irrelevant.
24      But you're asking him about after the fact,
25  correct?  You're saying after all this is over, now

1    looking back -- are you saying, was he involved in
2    any criminal activity?  Is that what you're asking?
3    BY MS. ADOLPHE:
4        Q.  I'm asking him, looking back -- looking back,
5    Officer Saunders, do you believe that Grant was involved
6    in any criminal activities?
7        MR. STEPHENS:  Right.  And you're talking
8    about with regards to the ShotSpotter alert,
9    correct?
10       MS. ADOLPHE:  With regard to the stop, yes.
11       MR. STEPHENS:  Not the -- well, not -- okay.
12    Just the reason for stopping.
13       MS. ADOLPHE:  Yes.
14       MR. STEPHENS:  Okay.  You can answer.  She's
15    asking you what you believe now.
16       THE WITNESS:  I don't know.  I don't know if
17    he did it or not.
18    BY MS. ADOLPHE:
19       Q.  Do you know that the ShotSpotter alert in this
20    case was inaccurate?
21       A.  No, ma'am.  They -- they dispatched me to an
22    address.  I -- I went to that route.
23       Q.  Okay.  I'm just reviewing my questions.  I'm
24    almost done.  Okay?
25       A.  No problem.

1        Q.  What policies does your department have, if
2    any, regarding their reliance on ShotSpotter alerts?
3        A.  Well, they have this policy for the
4    ShotSpotter in -- in general.
5        Q.  Just a general policy?
6        A.  Yes, ma'am.
7        Q.  Is there a policy that governs stops of
8    individuals when there is no suspect description?
9        A.  There's a policy in reference to reasonable
10    suspicion.
11       Q.  Okay.  Is there a specific policy that governs
12    the use of takedowns and street encounters?
13       A.  Like defensive tactics?
14       Q.  Only if that would be the policy that governs
15    takedowns.
16       A.  Well, it's -- it's a form of control.  I'm not
17    sure if it's a policy, but I can't remember off the top
18    of my head if -- meaning, like, definitions of how to do
19    certain things?
20       Q.  Yeah, it's like a manual.
21       A.  No.  I'm -- I'm not sure if it's a policy, but
22    I'm pretty sure that it may have.  I'm not -- like I
23    said, I'm not sure.  They teach you hands-on so.
24       Q.  Okay.  I understand.  Does the department have
25    a policy that governs how to handle an injured person

1    during or after an arrest?
2        A.  I'm not -- not familiar.  I'm not sure.  But
3    from training --
4        Q.  Uh-hmm.
5        A.  -- a use of force -- there is a use-of-force
6    policy.  If -- if a person is complaining of any injury,
7    then it's considered a use of force, and they would get
8    transported to the hospital, which in this case the male
9    did.
10       Q.  Mr. Grant got transported to the hospital?
11       A.  I believe he got medically cleared, not
12    transported.  I'm sorry.
13       Q.  Okay.  All the policies that I just asked you
14    about, to your knowledge, did your action fully comply
15    with those policies?
16       A.  Yes, ma'am.  I was never reprimanded or given
17    a suspension or even written up for anything that I did
18    that day.  With that, I feel like everything that I did
19    was within the policy.
20       MS. ADOLPHE:  Okay.  I don't have any more
21    questions.  I don't know if your attorney has any.
22       MR. STEPHENS:  No questions.
23       COURT REPORTER:  Okay.  Before we go off the
24    record, I do have a few questions.
25       Will the witness like to read or waive?

1        MR. STEPHENS:  He'll -- he'll read it.
2        COURT REPORTER:  Okay.  And there was no
3    exhibits held during this deposition?
4        MS. ADOLPHE:  I'm sorry.  I didn't hear you,
5    Ebony.
6        COURT REPORTER:  There was no exhibits held
7    during the deposition?
8        MS. ADOLPHE:  That's correct.
9        COURT REPORTER:  And would anyone like to
10    order a copy of today's testimony or a transcript?
11       MS. ADOLPHE:  Yes, I would like a copy.
12       COURT REPORTER:  You would like to order the
13    testimony?
14       MS. ADOLPHE:  That's correct.
15       COURT REPORTER:  I'm sorry.  I said that
16    wrong, but I get what you mean.
17       And do you want a copy of that?
18       MR. STEPHENS:  Yeah, we'll take a copy.
19       COURT REPORTER:  Okay.  Then we will go off
20    the record at 11:29 a.m.
21       (Thereupon, the deposition was concluded at
22    11:29 a.m.)
23       (Reading and signing of the deposition
24    transcript was reserved.)
25

46

1                      CERTIFICATE OF OATH

2       STATE OF FLORIDA

3       COUNTY OF PALM BEACH

4

5            I, Ebony Payne, Court Reporter, Notary Public,

6       State of Florida, certify that Romario A. Saunders,

7       personally appeared before me on the 21st day of

8       August 2025, and was duly sworn.

9            Signed this 26th day of August 2025.

10

11

12

13       _____

14       Ebony Payne, Court Reporter

15       Notary Public, State of Florida

16       Commission No.: HH 645156

17       Commission Expires: 06/11/28

18

19

20

21

22

23

24

25

47

```
 1                  CERTIFICATE OF REPORTER

 2      STATE OF FLORIDA

 3      COUNTY OF PALM BEACH

 4

 5          I, Ebony Payne, Court Reporter, certify that I

 6      was authorized to and did report the Deposition of

 7      Romario A. Saunders; that a review of the

 8      transcript was reserved; and that the transcript is

 9      a true and correct record of my notes.

10          I further certify that I am not a relative,

11      employee, attorney, or counsel of any of the

12      parties, nor am I a relative or employee of any of

13      the parties' attorneys or counsel connected with

14      the action, nor am I financially interested in the

15      action.

16          Dated this 26th day of August 2025.

17

18

19      _____

20          Ebony Payne, Court Reporter

21

22

23

24

25
```

**A**

**a.m** 1:12,12 4:4
  45:20,22
**able** 6:13,22
  11:4 21:20
  34:20
**above-styled**
  1:19
**academy** 8:17
  8:21
**access** 21:4,5
**accomplish**
  37:14
**accurate** 5:18,23
**act** 18:18
**action** 25:22
  44:14 47:14,15
**activation** 14:14
**active-shooter**
  37:3
**activities** 42:6
**activity** 20:1
  41:18 42:2
**additional** 13:16
  33:16,18
**address** 14:13
  18:3,4 42:22
**Adolphe** 2:3,8
  3:3 4:12,12,25
  5:3,6 6:16 7:2
  8:9 9:7,15
  10:19 11:2,8
  11:20,24 12:3
  12:5,6,11,25
  15:16,20 16:8
  16:14 23:25
  29:6,20 30:17
  35:18 36:10,12
  36:14 38:16,17
  39:3,7,10
  40:24,25 42:3
  42:10,13,18
  44:20 45:4,8
  45:11,14
**aggressive** 22:3
  27:2,3
**Ah** 13:17 22:13
**ahead** 4:24 6:9
  6:25 8:15

11:18 12:22
  16:13 23:15,16
  23:21
**alert** 14:8,18
  17:23 18:1,7
  19:2 21:7 40:2
  42:8,19
**alerts** 43:2
**allowed** 11:9
**altercation**
  34:12
**amount** 14:15
  14:22 28:6,8
  28:10,12,17
**answer** 5:16,16
  6:2,13,17,18
  6:18,22,25
  9:11 10:7,8
  12:4,8,10,15
  12:15,22 15:12
  15:13 38:10
  42:14
**anticipate** 6:7
**anybody** 15:25
**anyway** 9:11
**appearance** 4:11
**APPEARAN...**
  2:1
**appeared** 46:7
**appreciate**
  36:12
**approach** 13:6
**approached**
  21:13
**approaching**
  21:18
**appropriate**
  11:17 13:18
**Approximately**
  18:6 28:3
**area** 15:4,5,6
  16:17 18:7,17
  18:18 19:23
  20:8,11,21
  21:16 25:3,6,7
  25:8,11 27:24
  30:21,22 33:20
  33:21 36:2
**areas** 24:20

**arm** 21:24 22:5
  26:8,9,11,13
  32:5 33:23
**arm's** 23:3,3,8
**arms** 26:22
  33:11 34:2,3
**arrest** 44:1
**arrested** 30:23
**arrive** 18:6 19:7
**arrived** 18:13,22
  22:10 27:23,23
  33:17 36:16
  41:4
**arriving** 15:2,5
  15:7
**asked** 16:12
  21:16,21 22:11
  22:20 23:6,23
  24:3,7 29:25
  44:13
**asking** 9:10,13
  9:16 10:18,19
  10:20,25 11:6
  11:7,8,14,15
  11:16 15:25
  16:6,7 18:25
  38:11 41:21,24
  42:2,4,15
**assess** 21:3,5
**assessing** 27:22
  27:23
**assigned** 24:21
  24:24 25:3
**assignment** 19:1
**assist** 41:11
**assisting** 16:23
  22:10
**assist** 21:1
**attempt** 25:15
  25:17,20
**attorney** 6:17
  44:21 47:11
**attorney's** 5:11
**attorneys** 47:13
**August** 1:12 4:3
  5:8 7:18 14:7
  37:20,20 46:8
  46:9 47:16
**authorized** 47:6
**aware** 17:25

35:13,16,19
  41:1

**B**

**back** 19:20,23
  20:11,12,16
  26:4,5 32:19
  32:20 34:4
  38:14 41:17
  42:1,4,4
**backup** 36:23
**bad** 29:14,15
  34:10
**balled** 25:16,21
  26:17,17,19,22
**Banyan** 24:25
  25:1
**based** 11:24
  13:1 14:8
  17:23 38:7,7
  38:19,25 39:4
  39:19
**battery** 40:13,14
**Beach** 1:7 2:13
  4:7 7:9,12,21
  8:1 14:19 46:3
  47:3
**beginning** 37:17
**behalf** 2:2,10
  4:12,14
**believe** 8:19,22
  10:13 15:23
  20:3 21:9,25
  22:16,23 24:5
  25:4,20 27:25
  30:12 39:20,22
  41:17 42:5,15
  44:11
**believed** 22:3
  41:22
**best** 9:11
**better** 33:2,11
  33:13
**block** 15:8 19:14
**blows** 32:7
**body** 16:25 17:1
  17:1,15,17,19
  26:3 28:14
  32:17,18 33:13

33:19 34:1
  41:3,4,6
**break** 6:8,9,10
  22:7 32:5
**bring** 26:22
**broad** 9:10 10:8
  10:18 11:1,14
  12:16
**broom** 31:19
**BRYANT** 1:4

**C**

**C-O-Y** 40:23
**call** 14:8 20:7
**calls** 19:6
**cam** 28:14 41:6
**camera** 16:25
  17:2,15,16,17
  17:19 41:1,3,5
**capacity** 4:16
  7:14
**case** 1:2 5:7
  10:12 11:14
  12:2 42:20
  44:8
**cause** 1:19
**certain** 37:13
  43:19
**Certificate** 3:4,5
  46:1 47:1
**certify** 46:6 47:5
  47:10
**chance** 28:13
**change** 33:10
**charged** 40:11
**charges** 40:14
**checked** 4:6
**chest** 27:13,13
  28:5,5
**citation** 13:8
**city** 1:7 7:9,11
  10:15 24:24
**clarifying** 23:10
**clear** 26:15
  30:10 36:15,15
  38:22
**cleared** 44:11
**clenched** 22:2
**client** 19:11

**close** 23:4
**code** 14:20
**come** 16:21
  18:23 30:7
**comfortable**
  32:9,9
**coming** 14:14
**commands**
  21:14 22:19,20
  39:23
**commencing** 4:6
**Commission**
  46:16,17
**committed**
  30:12
**communicating**
  28:22
**communication**
  15:2
**complaining**
  44:6
**complete** 6:13
  6:22
**comply** 44:14
**concealed** 22:1
**concealing** 22:1
**concerning** 8:7
  8:11 40:17
**concluded** 45:21
**condition** 38:4,7
  38:19
**confirmed** 15:10
  15:18,25 16:16
**confused** 39:12
  39:15,20
**connected** 47:13
**consider** 36:23
  37:5
**considered** 44:7
**considering**
  29:24
**contraband**
  22:23 23:7
**control** 27:17
  33:4,6,7,8,11
  33:13 34:1
  37:8 43:16
**controlling** 33:2
**conversation**

23:1,4,6 24:16
  30:1 36:17
**copy** 45:10,11
  45:17,18
**correct** 13:4,5
  14:9 17:17
  20:10 23:12
  31:13 32:1
  34:22 35:14
  36:21,22 38:23
  41:25 42:9
  45:8,14 47:9
**correctly** 23:22
**counsel** 4:10,24
  47:11,13
**COUNTY** 46:3
  47:3
**court** 1:1,16 4:2
  4:9,17,23 5:14
  5:15 14:19
  15:8 19:14
  38:13 44:23
  45:2,6,9,12,15
  45:19 46:5,14
  47:5,20
**crime** 30:12
**criminal** 41:18
  42:2,6
**crosswalk** 10:1
**current** 7:16
**currently** 7:7,25

**D**
**date** 37:16,24
**Dated** 47:16
**day** 15:10 16:16
  20:23 44:18
  46:7,9 47:16
**decide** 20:25
**decided** 21:2
**Defendant** 2:10
**Defendants** 1:9
**defensive** 43:13
**definition** 20:14
**definitions**
  43:18
**delay** 41:5
**department**
  7:10 8:1 14:3,5

43:1,24
**deposed** 12:13
**deposition** 1:11
  1:14,18 4:4,6
  5:9 12:19
  28:14 45:3,7
  45:21,23 47:6
**describe** 8:3,6
  19:4 27:3,5
**description**
  14:24 20:17,19
  43:8
**designated**
  24:20
**detain** 20:25
**detentions** 8:4
**determine** 18:2
**different** 5:10
  18:18
**Direct** 3:3 5:2
**direction** 25:25
**discharged**
  14:15,22 20:4
**Discharging**
  30:13
**Dispatch** 14:11
  15:2
**dispatched** 14:8
  17:22 19:24
  20:7 42:21
**distance** 21:19
  23:2
**DISTRICT** 1:1
  1:1
**doing** 19:21
**Don** 2:16 4:14
  10:19
**doors** 16:24
**drafting** 41:11
**dstephens@os...**
  2:15
**duly** 4:21 46:8
**duties** 19:5

**E**
**earlier** 34:11
**Ebony** 1:16 4:9
  45:5 46:5,14
  47:5,20

**either** 39:14
**either-or** 13:9
**elapsed** 28:3
**employee** 47:11
  47:12
**encounter** 40:12
  41:15
**encountered**
  41:22
**encounters**
  13:22 43:12
**enforcement**
  12:18 14:6
**engaging** 19:25
  36:24
**entire** 24:13
  41:4
**ESQUIRE** 2:8
  2:16
**Evaluate** 19:9
**everyone's** 17:16
**exact** 19:5
**exactly** 19:15
  26:7 28:6
**Examination**
  3:3 5:2
**examined** 4:22
**example** 9:13,23
  13:3
**Excuse** 8:5
**exercise** 11:19
**exhibits** 45:3,6
**exited** 21:13
**experience** 9:20
  10:21 11:4,11
  11:24 13:1
  18:20
**experiences** 9:24
**experiencing**
  13:22
**expert** 10:6,9
**expertise** 10:20
**Expires** 46:17
**explain** 27:3

**F**
**face** 32:13,16,17
  32:18,18 39:12
**face-to-face** 26:1

**facing** 26:1
  32:18
**fact** 41:21,24
**fair** 5:18
**fall** 22:7 32:5
**familiar** 25:8
  31:9 44:2
**far** 39:25,25
**fault** 6:4
**faulty** 18:3
**FDLE** 14:3,5
**feel** 44:18
**fell** 31:23,25
  32:1,2
**field** 8:12,12,16
  8:24 13:12
  14:1,2 37:11
**fight** 27:6
**file** 40:16
**filed** 1:18
**financially** 47:14
**find** 30:18,22
**firearm** 20:4
  21:18,21 22:1
  22:4,17 30:13
**fired** 17:3
**first** 4:21 17:22
  18:9 19:11,15
  21:12 25:13
  28:4 37:2
**fists** 22:3 25:16
  25:21 26:17,19
  26:23 27:6,10
**Fitz-Coy** 17:8
  40:20,21,23
**five** 28:7
**flee** 25:15,17,21
**floor** 18:24
  29:18
**Florida** 1:1,17
  2:5,13 4:8 14:5
  14:19 46:2,6
  46:15 47:2
**follow-up** 15:1
**follows** 4:22
**footage** 16:25
  17:1,2,15
**force** 13:19 44:5
  44:7

**forehead** 32:13
**form** 8:8 9:6
  15:11 23:20
  35:15 38:9
  39:2 41:20
  43:16
**forth** 19:20,23
  20:11,13,16
**four** 7:13 14:23
  14:23 20:4,7
  21:15
**frisk** 34:16
**front** 26:16
  27:10
**FTO** 13:12
**full** 6:13,22 7:5
**fully** 39:22 44:14
**further** 15:1
  47:10

_____
**G**
**gain** 27:16 37:8
**general** 10:8
  11:14 12:2
  43:4,5
**give** 5:16 6:13
  6:22 9:23
  22:18 26:5
  28:18
**given** 14:24
  20:18 44:16
**go** 4:23 6:9,25
  8:15 9:4 11:18
  11:19 12:22
  16:13 18:4,4
  23:15,16,21
  31:21 44:23
  45:19
**goal** 37:8
**going** 21:2 23:17
  25:4 26:25
  27:6 34:12
  37:4
**good** 4:2 5:4,5
  27:8
**governs** 43:7,11
  43:14,25
**grabbed** 21:24
  22:5 27:11,13

27:15 28:5
  31:15
**Grant** 1:4 5:7
  19:11,16 20:25
  21:8,12 22:11
  23:2,17,18
  24:17 25:11,13
  25:15 27:18
  28:4,18 30:8
  30:11,19,23
  31:8,14 32:10
  32:16 33:23
  34:11,16,24
  35:1,11,19
  36:5,17,18,20
  36:24 37:25
  38:3,8,18
  39:19 40:1,9
  40:11 41:18
  42:5 44:10
**ground** 5:12
  28:24 30:2
  31:8,24,25
  32:16,17,19
  34:15,18
**grounds** 21:9
**GROUP** 2:3
**gun** 18:24 30:18
  30:22
**gun-related**
  18:14,16,22
**gunfire** 15:10
  16:16 18:11,17
  18:19 20:8
  21:15 37:3
**gunshot** 16:1

_____
**H**
**hand** 4:18 22:14
  22:18 32:15
  33:24
**handle** 43:25
**hands** 21:14,17
  21:19,20 22:12
  22:12,17
**hands-on** 43:23
**happened** 5:8
  21:11 27:9
  35:25

**he'll** 45:1,1
**head** 9:19 33:20
  33:21,25 43:18
**health** 38:4,6,19
  38:23 39:4
**hear** 17:6,13
  18:11 45:4
**heard** 16:18,22
  17:4,4
**held** 45:3,6
**HH** 46:16
**hit** 27:1 32:6,10
  32:13,14
**hits** 33:15
**hold** 12:14,14
**holding** 26:12
  26:12,14 34:4
**holstered** 21:21
  22:16
**home** 24:17
**hospital** 17:10
  17:11 44:8,10
**hour** 28:11
**house** 40:3,4,7
**hypothetical**
  11:16 12:1
**hypotheticals**
  10:9 11:15

_____
**I**
**ID** 4:5
**identified** 18:7
**identify** 13:7
**illegal** 19:25
**illness** 13:22
**immediately**
  34:25
**important** 5:15
**impossible** 12:4
  12:7
**inaccurate** 18:1
  42:20
**inappropriate**
  12:19
**incident** 5:7
  10:7,23 18:14
  18:16 24:14
  25:10 36:21
  37:22 40:17

41:2
**incidents** 18:22
**independently**
  15:9 16:15
**INDEX** 3:1
**individual** 4:15
  9:25 13:6
  15:18 16:1
  20:3,4
**individually** 1:8
**individuals**
  13:22 20:20
  43:8
**inform** 13:7
**information**
  10:16 14:11
  16:21 38:3,18
**informed** 14:14
**infraction** 10:2
  13:7
**injured** 34:24
  35:1,3,7,14,16
  35:20 43:25
**injuries** 17:10
**injuring** 35:5
**injury** 44:6
**interaction** 30:7
  30:11 36:5
**interested** 47:14
**intrusive** 37:5
**investigate** 21:2
**involved** 10:22
  34:22 41:18
  42:1,5
**irrelevant** 41:23

_____
**J**
**J** 2:8

_____
**K**
**knocks** 16:24
**know** 5:13,21
  6:3,5 8:18
  10:10 15:9,16
  15:17 16:10,15
  16:21 17:5
  24:14 29:10
  31:1,5,6 35:2
  37:15,25 38:14
  39:25 42:16,16

42:19 44:21
**knowledge** 11:8
  11:9,10,13
  44:14

_____
**L**
**Lake** 2:5
**landed** 22:7
**Large** 1:17
**law** 2:3 12:18
  14:5
**lawyer** 10:25
  11:3
**lay** 11:17 12:19
**led** 21:9
**left** 32:15,15
  33:23
**leg** 22:6 31:14
  31:16,20,22,22
**legal** 21:9
**length** 23:4
**Let's** 7:4
**lieutenant** 17:8
  17:14 40:20
**lines** 30:2
**lived** 37:25
**located** 4:7
  19:15
**location** 14:18
  40:2
**long** 6:8 7:11
  25:3 28:16
  32:3,4
**longer** 28:9
**look** 31:3 39:1,5
  39:12,15
**looking** 41:17
  42:1,4,4

_____
**M**
**ma'am** 5:19,25
  6:6,20 7:1,24
  8:2,25 13:25
  14:10,17,25
  15:17,19 16:20
  17:12,24 18:10
  18:12,23 20:22
  28:2,10,12,17
  30:20 32:20
  38:5,15,21

39:9,16 40:18
41:3,13,16
42:21 43:6
44:16
**maintained**
26:16
**making** 29:14
**male** 44:8
**maneuver** 31:21
32:21
**manual** 43:20
**match** 20:17
**mean** 19:19
22:15 25:17
45:16
**meaning** 43:18
**means** 39:15
**medically** 44:11
**mental** 13:22
38:4,6,19,23
39:4
**met** 40:1,8
**middle** 37:18
**mild** 33:7
**mine** 18:21
**minutes** 28:3,7,9
**misunderstood**
16:12
**months** 8:19,19
8:24
**morning** 4:2 5:4
5:5
**mount** 33:6,8,8
**moved** 36:3
**mumbling** 21:22

**N**

**name** 4:9 5:6,6
7:5,6 23:23,24
23:24 24:1,2
31:7,9 33:3
**need** 6:8,19 9:7
19:8
**needs** 9:9 19:9
**neighborhood**
17:3 30:7 38:1
**neighbors** 16:17
16:19,22
**nervous** 29:14

**never** 36:20 38:2
44:16
**night** 30:18
**Nighttime** 20:24
**noise** 35:5
**normally** 37:17
**north** 19:18
24:24,25
**Notary** 1:17
46:5,15
**notes** 31:12 47:9
**notice** 1:18
34:24
**number** 19:17
**numeric** 19:17

**O**

**Oath** 3:4 46:1
**objecting** 12:16
**objection** 6:15
6:24 8:8 9:6
10:5 11:23,25
15:11 23:20,21
35:15 38:9
39:2 41:20
**objective** 27:16
**observation**
39:19
**observe** 19:21
19:25 21:8
38:6
**observed** 17:15
19:16
**occurred** 37:22
41:15
**occurring** 30:8
**offense** 40:11
**officer** 4:15 5:4
7:7,15,22,23
7:25 8:20
13:13 16:9
24:19 34:21
40:13 42:5
**officer's** 4:5
**officers** 16:23,23
22:10 30:22
33:16 35:25
36:16
**Oh** 23:21 29:13

33:9 36:11
39:17
**okay** 4:17 5:11
5:20,24 6:1,5
6:21 7:3,21
9:20 10:3
11:21 12:3,23
13:6 14:16,21
15:15,20 16:2
16:4,4 17:19
19:1 20:17,20
22:11,21 23:8
23:22 24:4,16
25:15 26:6,15
27:8,14 28:13
28:18 29:5,5,5
29:5,11,21
30:4,10,14
31:1,4,15,23
32:21 33:5,9
33:11,14,18
34:1,21 35:10
35:25 36:11,11
37:20,25 38:25
39:11,13,17,22
39:25 40:7,11
40:16 41:6,11
41:17 42:11,14
42:23,24 43:11
43:24 44:13,20
44:23 45:2,19
**OLDS** 2:11
**once** 19:7 21:19
25:21 27:9,22
27:23 32:5
33:14 36:4,16
**operating** 8:12
**opinion** 10:11
12:17
**opposed** 41:21
**order** 45:10,12
**overbroad** 12:2

**P**

**P.A** 2:3,11
**pacing** 19:18,19
19:23 20:11,12
20:14
**PAGE** 3:2

**Palm** 1:7 2:13
4:7 7:9,12,21
8:1 10:15
14:19 46:3
47:3
**park** 19:13
**parked** 19:12
40:5,6
**part** 18:20 24:14
**parties** 47:12
**parties'** 47:13
**pat** 34:16
**patrol** 7:15
24:19,20,21
**patrolman** 7:17
7:20 19:3,4
**Payne** 1:16 4:9
5:1 46:5,14
47:5,20
**pedestrian** 8:3,7
8:11 9:2,3,5,14
9:17,21 10:4
10:21 11:22
13:2
**penis** 29:17
**people** 18:18,18
**Perfect** 5:20
6:12,12
**person** 20:8
21:22 22:6,23
27:24 43:25
44:6
**personal** 10:21
11:9,10,10,12
**personally** 18:11
46:7
**physically** 34:21
36:24
**place** 40:8
**Plaintiff** 1:5 2:2
4:13 16:24
17:2,11 20:9
**please** 4:10,19
7:5 12:24
16:10
**Poinciana** 2:4
**point** 27:17
**police** 4:5 7:9,22
7:22,25 8:1

**policies** 43:1
44:13,15
**policy** 43:3,5,7,9
43:11,14,17,21
43:25 44:6,19
**position** 26:16
32:24 33:2,14
**positions** 33:10
**prefer** 6:2
**presence** 15:10
16:16
**present** 4:10
**pretty** 43:22
**prior** 4:6
**probably** 6:4
33:16 40:3
**problem** 38:16
42:25
**proceeding** 5:10
**program** 8:12
8:13,16,20
13:12,13
**provide** 13:9
14:11
**provided** 10:1
13:4 14:13
20:19
**public** 1:17
30:13 46:5,15
**pull** 26:7
**pulled** 21:24
22:2,5 25:16
25:23,25 26:3
26:6,7,8,10,10
26:14,15
**pulling** 25:17,18
25:20
**pursuant** 1:18
**put** 22:12

**Q**

**question** 6:3,19
9:8 12:1,8,16
12:19,22,24
15:22 16:8
22:20 24:8,10
**questions** 6:1,14
6:23 10:7,8,20
10:20 11:16

29:4 42:23
44:21,22,24
**Quickly** 26:24
**quiet** 15:24

___

**R**

**raise** 4:18
**rank** 7:16,18
**reach** 23:3,9
**reaction** 35:11
**read** 38:14 44:25
45:1
**Reading** 45:23
**really** 28:24
**reason** 42:12
**reasonable** 20:2
20:6 43:9
**reasons** 6:12,21
**receive** 33:15
**received** 9:17
10:14 13:11,14
13:16,18,21
37:21
**record** 4:3,11
5:18,23 7:4
30:10 36:15
44:24 45:20
47:9
**recording** 41:1
**reference** 13:3
37:2 43:9
**referring** 35:23
**reflect** 41:14
**refrain** 5:22
**regard** 42:10
**regarding** 10:7
11:13 13:21
43:2
**regards** 42:8
**Regular** 7:17
**relative** 47:10,12
**release** 8:17
**released** 8:21,23
**relevant** 11:13
**reliance** 43:2
**relied** 37:9
**remember** 9:17
23:22 24:9,13
24:18 29:7,8

34:4 37:19,21
39:7,8,11,14
39:16 41:10
43:17
**remembering**
39:17
**repeat** 6:19 9:7
9:10 12:23
38:16
**rephrase** 8:10
**report** 18:8
40:16,18,19
41:7,12,14
47:6
**reporter** 1:16
3:5 4:2,10,17
4:23 5:14,15
38:13 44:23
45:2,6,9,12,15
45:19 46:5,14
47:1,5,20
**represent** 5:7
**representative**
12:9
**reprimanded**
44:16
**requirements**
14:2
**reserved** 45:24
47:8
**resistance** 27:14
**respect** 29:23
**respond** 19:6,7
24:5,12,15
**responded** 23:11
24:6
**responding** 4:21
16:23 19:2
**response** 13:10
**result** 40:12
**review** 28:13
40:19 41:6
47:7
**reviewing** 42:23
**reword** 6:5
**right** 4:18 7:4
10:24 16:5
21:24 22:5,6,7
29:22 31:14,16

32:5 42:7
**rjadolphe@ad...**
2:7
**roadway** 19:18
20:9,13
**Rollande** 2:8
4:12 5:6
**Romario** 1:8,15
2:10 3:2 4:5,15
4:20 7:6 46:6
47:7
**rounds** 14:15,21
14:22,23 20:5
20:7 21:15
**route** 42:22
**rules** 5:12
**run** 25:23,24

___

**S**

**safety** 21:15
**Saunders** 1:8,15
2:10 3:2 4:5,15
4:20 5:4 7:6,8
12:7 16:10
42:5 46:6 47:7
**saw** 18:24 21:12
22:15 28:4
30:9
**saying** 11:18
12:21 17:4
23:14 36:8
41:25 42:1
**says** 35:12
**scene** 15:3 18:9
18:13,24 19:9
21:3,4,5,5
27:22,23 28:16
31:2 36:1,4,8
36:16 37:2,9
41:4
**school** 37:4
**scream** 35:6,8
**screamed** 35:4
**second** 25:4,5,6
**see** 5:14 18:13
18:21 19:9,11
21:14,16,19,20
22:11,17,18
40:13

**seen** 25:11,13
36:20 38:2
**served** 35:24
**service** 19:6
**shot** 16:1
**shots** 16:18,22
17:3,5
**ShotSpotter**
13:11,15 14:8
17:23,25 21:7
40:2 42:8,19
43:2,4
**side** 32:13 33:2,4
33:4,6,7,8,8
36:3
**sidewalk** 20:12
**Signed** 46:9
**signing** 45:23
**signs** 18:14,21
39:1,5
**situation** 27:17
37:4
**six** 8:19,19,23
**somebody** 27:6
**soon** 41:4
**sorry** 8:15 16:13
20:14 21:6
23:16 25:18
34:7 44:12
45:4,15
**south** 19:18
**SOUTHERN**
1:1
**speak** 16:19
27:25 28:1
**speaking** 17:7,8
**specific** 9:18,23
11:7 19:1 21:8
30:12 31:7
37:16 40:8
43:11
**specifically** 6:18
9:2,16 15:6
23:6
**speculation** 6:15
10:6
**spent** 8:23
**spoke** 38:8
**spot** 32:9 33:1

**stance** 22:3
26:25 27:2,4,9
**start** 25:23
**started** 21:22
**state** 1:17 4:10
7:5 31:13 46:2
46:6,15 47:2
**stated** 34:10
**STATES** 1:1
**stay** 32:3
**stayed** 22:8,9
**step** 19:8
**Stephens** 2:11
2:16 4:14,14
6:15,24 8:8 9:6
9:9 10:5,24
11:6,12,23,25
12:4,10,14
15:11,13,21
16:3,5,11
23:20 29:3,19
30:15 35:15
36:7,11,13
38:9,13 39:2,6
40:23 41:20
42:7,11,14
44:22 45:1,18
**stop** 9:14 10:2,3
10:4 11:21
13:2 20:25
21:9 42:10
**stopped** 41:19
**stopping** 27:19
42:12
**stops** 8:4,7,11
9:2,3,3,5,17,21
10:22 43:7
**street** 2:12 9:25
41:1 43:12
**strike** 22:8
**struck** 31:14
33:25
**stuff** 9:11 10:11
10:14,18 35:21
35:22
**submitted** 40:18
**subpoenaed**
10:15
**suffered** 38:4,19

**Suite** 2:4
**supposed** 19:5
**sure** 5:11,13
  12:5 15:21
  16:7 17:21
  19:17 28:6,8
  28:10,12,17
  30:24 33:24
  37:24 39:15
  43:17,21,22,23
  44:2
**suspect** 14:24
  20:17,19 43:8
**suspension**
  44:17
**suspicion** 20:2,6
  43:10
**swear** 4:17
**sweep** 31:18
**sweeping** 31:19
**swept** 22:6
  31:15,16,18,22
**swiped** 31:17
**sworn** 4:21 8:20
  46:8
**system** 18:3

**T**
**tactics** 43:13
**take** 6:10 8:16
  26:25 31:8,12
  31:14 37:3
  45:18
**takedown** 34:22
  34:25 37:5
**takedowns**
  43:12,15
**taken** 1:16 5:9
**talk** 10:3 11:21
  13:2
**talking** 15:22
  30:15 42:7
**teach** 43:23
**technique** 31:4,5
  31:7 32:8,22
  32:25 33:3
**tell** 18:4 24:17
  27:18 32:12
**telling** 12:15

15:4
**tells** 6:17
**testified** 4:22
**testimony** 3:2
  45:10,13
**Thank** 4:23,25
  4:25 7:3 13:10
  14:7 21:7
  23:10 29:23
  30:6 33:9
  36:12 39:17
  40:24
**thing** 11:7
**things** 11:14
  43:19
**think** 9:9 10:14
  15:24 16:11
  30:16,24 36:8
  39:6
**threat** 29:24
**threats** 28:19
**Thursday** 1:12
**time** 6:8 7:19 9:1
  10:10 14:12
  17:9,22 18:6
  20:23 22:12
  24:16,22 25:13
  27:25 28:1,4
  28:17,20,21
  30:11 31:3,23
  33:12 34:16,19
  35:13 37:13
  39:20,22 41:4
  41:5,19
**times** 17:25
**today** 4:3,7 6:14
  6:23
**today's** 45:10
**told** 35:4
**top** 9:19 32:1,3
  43:17
**total** 14:23
  28:16
**trained** 9:4
  10:17 18:2,5
**training** 8:3,11
  8:12,16,19,24
  9:1,16,18
  10:14 13:11,12

13:15,16,18,21
  14:1,2 37:9,10
  37:10,11,12,14
  37:21,22 38:7
  38:7,20,22,25
  39:4 44:3
**trainings** 8:6
**transcript** 45:10
  45:24 47:8,8
**transitioned**
  32:7
**transported**
  44:8,10,12
**tried** 31:14 32:4
  32:5,6,10
**true** 47:9
**try** 9:11 12:21
  32:11
**trying** 10:17
  12:17 22:7
  31:12
**turn** 26:3
**two** 23:2 26:1
  28:21,21 40:3
  40:4,7
**type** 38:6 39:5

**U**
**Uh-hmm** 44:4
**uh-huh** 5:21
  31:10
**uh-uh** 5:21
**understand** 6:2
  6:3,11 12:12
  15:22 16:9
  21:23 22:25
  23:11,13,19
  27:8 28:24
  31:20 36:7,10
  38:10 39:13,13
  39:14 43:24
**understood**
  31:12 39:23
**unholstered**
  21:18
**UNITED** 1:1
**upset** 24:10
**use** 5:21 13:11
  13:15,19 32:8

43:12 44:5,7
**use-of-force**
  40:16 44:5

**V**
**vague** 12:16
**vehicle** 19:12,13
  21:13 40:5,6
**verbal** 5:16
  21:14 28:18
**verbatim** 17:5
**vest** 34:7,8
**vicinity** 16:18
**vs-** 1:6

**W**
**wait** 16:5,5
**waiting** 36:23
**waive** 44:25
**Walk** 21:11
**walking** 19:20
  20:10,12,16
  23:5
**walks** 9:25
**want** 15:21,23
  16:6 29:16,16
  45:17
**warning** 13:8
**warranted** 13:8
**wasn't** 18:5
  20:12 31:2
  32:4 34:20
  35:16
**waste** 10:10
**watch** 17:1
**way** 18:5 22:6
  24:17,25
**ways** 18:18 40:6
**we'll** 6:9 45:18
**we're** 30:10
  39:18
**we've** 10:9
**weapon** 18:17
**went** 5:12 21:15
  33:1 42:22
**West** 1:7 2:13
  4:7 7:9,12,21
  8:1 10:15
  14:19
**withdraw** 23:21

**witness** 4:7,18
  7:1 9:13 11:18
  12:20,23 15:12
  15:15,17 16:2
  16:4 23:22
  29:1,5 36:9
  38:12,15 39:8
  42:16 44:25
**word** 22:23 29:1
  29:14,15,17
  34:10
**wording** 6:5
**words** 5:21,22
  21:22 23:13
**work** 7:7,9,14,22
  7:25
**worked** 7:11
**working** 7:21
**world** 12:18
**worn** 17:15,17
  17:19
**Worth** 2:5
**wouldn't** 6:13
  6:22
**wrist** 22:8 26:9
  26:13,14
**write** 5:17
**written** 44:17
**wrong** 11:3
  16:12 31:13
  45:16
**wrote** 41:7

**X**

**Y**
**yeah** 6:24 13:3
  15:13,14 16:11
  23:4,8 29:19
  30:5 32:2,11
  33:22 36:13
  43:20 45:18
**year** 25:4,5,6
  37:12,13,16,18
  37:18,23
**yearly** 13:17,20
  13:24 37:10,12
  37:14,22 38:23
**years** 7:13

**Z**

**zip** 14:20
**Zoom** 1:11

**0**

**06/11/28** 46:17

**1**

**1** 2:4
**10:14** 1:12 4:4
**11:29** 1:12 45:20
  45:22
**11th** 2:12
**13** 5:8 7:18 14:7
  37:20
**1300** 15:8 19:14
**1387** 14:19

**2**

**2020** 13:14
**2022** 8:22
**2023** 5:8 7:18
  14:7 37:21
**2025** 1:12 4:3
  46:8,9 47:16
**21** 1:12
**21st** 4:3 46:7
**23:05** 18:8
**26th** 46:9 47:16

**3**

**30** 28:9
**312** 2:12
**33401-3322** 2:13
**33467-2991** 2:5
**3918** 2:4

**4**

**46** 3:4
**47** 3:5

**5**

**5** 3:3
**561** 2:6,14
**59th** 24:25 25:1

**6**

**645156** 46:16
**660-7776** 2:6

**7**

**8**

**832-6814** 2:14

**9**

**9:25-CV-8003...**
  1:2
**9th** 14:19 15:8
  19:14